## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| SALVATORE ARCIDIACONO, WILLIAM BROWN, and WILLIAM SARCHET, individually and as the representatives of a class of similarly-situated persons, <br><br> PLAINTIFFS, <br><br> v. <br><br> ELIZABETH M. WHITEHORN, in her official capacity as Director of the Illinois Department of Healthcare and Family Services, 201 South Grand Avenue East Springfield, IL 62763, <br><br> and <br><br> DULCE QUINTERO, in their official capacity as Secretary of the Illinois Department of Human Services, 100 South Grand Avenue East, Springfield, IL 62762, <br><br> DEFENDANTS. | Case No. _____ <br><br> Judge  1:24-cv-412_____ <br><br><br> CLASS ACTION COMPLAINT <br><br><br> JURY TRIAL DEMANDED |

### CLASS ACTION COMPLAINT FOR
### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiffs Salvatore Arcidiacono, William Brown and William Sarchet (collectively "Plaintiffs") bring this action on behalf of themselves and all other persons similarly situated and, except for those allegations pertaining to Plaintiffs or their attorneys, which are based upon personal knowledge, allege the following upon information and belief against the Defendants, Director of the Illinois Department of Healthcare and Family Services ("HFS") and Secretary of the Illinois Department of Human Services ("DHS").

## PRELIMINARY STATEMENT

1.     This lawsuit concerns Defendants' use of Medical Electronic Data Interchange ("MEDI") admission packets to illegally delay and reject payment of long-term Medicaid benefits to eligible residents of nursing facilities in the State of Illinois. This practice began after a judgment in the case of *Doctors Nursing v. Norwood*, wherein a group of Medicaid-eligible Illinois nursing home residents brought suit against HFS for failure to timely process claims for long-term care benefits. In that case, Judge Elaine Bucklo ordered HFS to process claims for payment of services within twelve months of receiving notice of the claims. *Doctors Nursing v. Norwood*, Case No. 1:16-cv-9837, 2017 WL 3838031 at *10 (N.D. Ill. Sept. 1, 2017). Instead of complying with the Court's order, HFS, with the help of DHS, began to use the MEDI admission packet process to deny payments to the nursing facilities where eligible residents reside, leaving the residents with large balances that they had no hope of paying. Not only do Defendants have a practice of rejecting MEDI admission packets for arbitrary and capricious reasons, such as misspelled names and transposed digits, they have no legal basis to make the MEDI admission packets a precondition for the payment of benefits and provide no method to appeal the rejections. The result is that the due process rights of thousands of Illinois nursing home residents have been violated.

## JURISDICTION AND VENUE

2.     The Court has jurisdiction over this suit under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Federal Medicaid Act and its implementing regulations and seeks to redress the deprivation under color of state law, statute, custom and/or usage of a right, privilege and/or immunity secured to Plaintiffs by the Fourteenth Amendment to the Constitution of the United States. Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202

and 42 U.S.C. § 1983.

3.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial

part of the events or omissions giving rise to this claim occurred in this district.

## PARTIES

**I.     The Plaintiffs**

4.     Salvatore Arcidiacono is a Cook County, Illinois resident who was approved for

long-term care Medicaid benefits and was a resident of an Illinois nursing home, but Defendants

refused to pay benefits to the nursing facility where Mr. Arcidiacono resided on the basis of alleged

issues with the MEDI admission packet submitted on Mr. Arcidiacono's behalf.

5.     William Brown is a Cook County, Illinois resident who was approved for long-term

care Medicaid benefits and was a resident of an Illinois nursing home, but Defendants likewise

refused to pay benefits to the nursing facility where Mr. Brown resided on the basis of alleged

issues with the MEDI admission packet submitted on Mr. Brown's behalf.

6.     William Sarchet is a Cook County, Illinois resident who was approved for long-

term care Medicaid benefits and was a resident of an Illinois nursing home, but Defendants

likewise refused to pay benefits to the nursing facility where Mr. Sarchet resided on the basis of

alleged issues with the MEDI admission packet submitted on Mr. Sarchet's behalf.

7.     Mr. Arcidiacono, Mr. Brown and Mr. Sarchet represent numerous Illinois nursing

facility residents in similar circumstances: they were approved for long-term care Medicaid

benefits, but Defendants refused to pay those benefits to the nursing homes where they resided

based on alleged issues with the MEDI admission packet submitted on their behalf. Because of

Defendants' refusal to pay benefits, Mr. Arcidiacono, Mr. Brown, Mr. Sarchet, and others like

them have been left with large balances owed to the nursing facilities that they have no hope of paying.

## II.     The Defendants

8.      Defendant Elizabeth M. Whitehorn is the director of the Illinois Department of Healthcare and Family Services ("HFS"). HFS is an Illinois state agency that provides Medicaid services to enrollees in Illinois. HFS is the state agency responsible for administering Medicaid in the State of Illinois. At all times material to this Complaint, Defendant Whitehorn acted under color of state law in administering the regulations, customs, policies, and practices material herein. She is sued in her official capacity only.

9.      Defendant Dulce Quintero is the secretary of the Illinois Department of Human Services ("DHS"). HFS assigns certain tasks in the processing of Medicaid long-term care applications and admissions to DHS. On information and belief, this includes the processing of the MEDI admission packets at issue in this case. At all times material to this Complaint, Defendant Quintero acted under color of state law in administering the regulations, customs, policies, and practices material herein. They are sued in their official capacity only.

## FACTUAL BACKGROUND

## I.     The Medicaid Application Process for Reimbursement of Nursing Facility Services

10.      Under Defendants' current practice, three items must be successfully submitted and approved before Defendants will pay long-term care Medicaid benefits to a nursing facility on behalf of a Medicaid-eligible resident: first, the resident must submit an Application for Benefits Enrollment (an "ABE application"), which is an application for general Medicaid benefits; second, the resident must submit a request specifically for long-term care benefits; third, the resident's

4

nursing facility must submit a MEDI admission packet with respect to the resident. The MEDI admission packet is also known as HFS Form 1156.

11. This Complaint concerns the third item. Defendants are refusing to pay long-term care benefits on the basis of alleged issues with the MEDI admission packets even after residents have proven their eligibility for such benefits through approved ABE Applications and long-term care requests.

## II.  Defendants' Rejection of MEDI Admission Packets

12. Defendants routinely reject and delay MEDI admission packets for trivial reasons and for reasons that result from Defendants' own sloppy practices. The following are various examples:

13. *Insufficient information on a different form*. If Defendants determine that the resident has provided insufficient financial information on his or her long-term care benefits request—even if the same information has already been provided with the resident's ABE application—Defendants will reject the resident's MEDI admission packet.

14. *Failure to attach an OBRA screening*. Applicants for long-term care benefits must obtain an "OBRA screening" to determine if institutional placement or home and community-based services are appropriate and allowable. A copy of the OBRA screening certification must be included in the MEDI admission packet for a resident.

15. If a nursing facility fails to attach the certification to the MEDI admission packet for any reason, Defendants will reject the packet instead of allowing the facility to supplement the already-submitted MEDI admission packet. This is so even if the screening has been timely completed and even if the certification was unavailable at the time the facility submitted the MEDI admission packet.

16.     *Misspelled names*. Defendants will reject a MEDI admission packet if a nursing facility spells the resident's name on the packet differently from the spelling in Defendants' records.

17.     *Transposed digits*. Defendants will reject a MEDI admission packet if a nursing facility transposes the digits in an International Classification of Diseases ("ICD") code.

18.     When Defendants reject a MEDI admission packet for any reason, they do not permit the nursing facility to simply correct the error on the submitted packet. Instead, Defendants require the nursing facility to submit an entirely new MEDI admission packet. As a further insult, Defendants will sometimes reject a new MEDI admission packet because the date on the new submission does not match the original facility admission date.

## III.    MEDI Admission Packet Deadlines

19.     Once Defendants have rejected a MEDI admission packet for one of any number of trivial reasons and the nursing facility is forced to submit a new packet, Defendants will then frequently consider the new packet to be untimely and refuse to pay benefits incurred prior to the submission date of the new packet.

20.     89 Ill. Adm. Code § 140.513(b) establishes deadlines for nursing facilities to submit the MEDI admission packet with respect to a resident. For residents admitted prior to September 1, 2014, the nursing facility must submit the MEDI admission packet within 15 days after the date that it receives the resident's OBRA screening certification. For residents admitted on or after January 1, 2018, the nursing facility must submit the MEDI admission packet within 45 days after the date that it receives the OBRA screening certification or verification for the resident or the resident's admission date; for residents admitted on or after January 1, 2022, the relevant period is 120 days.

6

21.     If a nursing facility fails to submit the MEDI admission packet within these deadlines, Defendants will refuse to pay for services rendered before the submission date of the MEDI admission packet. This policy arises out of 305 ILCS 5/5-5, which states: "Claims that are not submitted and received in compliance with the [MEDI admission packet] requirements shall not be eligible for payment under the medical assistance program and the State shall have no liability for payment of those claims." 89 Ill. Adm. Code § 140.513(c) reinforces this, stating: "Reported admissions and changes in resident status shall be used for the purposes of determining Medicaid reimbursement." Finally, HFS guidance specifies:

> The beginning date of payment is based upon the Medicaid eligibility date AND the requested admission date, the date of the pre-admission screening, the date the provider receives the required pre-admission screening results, *and the date the transaction is electronically submitted.* **If the admission transaction is not submitted timely, the DHS caseworker will use the date the provider entered the information in MEDI as the date of admission.**

HFS Provider Notice Re: Admission Transaction Submission Guidelines (Oct. 16, 2019) (capitalization and bold in original; italics added).

22.     If, for any reason, any substantial changes must be made to the State Plan, said changes must be approved by CMS before they can be put into practice.

23.     Federal regulations provide a procedure for CMS to approve or disapprove any material changes in state law, organization or policy respecting Medicaid.

24.     CMS will only approve proposed state plans and amendments if they comply with federal statutory and regulatory requirements. *Wilder v. Virginia Hospital Assn.*, 496 U.S. 498, 502 (1990); 42 C.F.R. § 430.10.

25.     42 C.F.R. § 430.12(c)(1)(ii) requires a state participating in Medicaid to first file a plan amendment with CMS whenever the state enacts a **"[m]aterial change[] in State law, organization, or policy"** respecting Medicaid (emphasis added).

7

26.     The U.S. Department of Health & Human Services (HHS), through CMS, reviews the plan and determines whether it complies with statutory and regulatory requirements. *See* 42 U.S.C. § 1316(a)(1) and (b).

27.     The United States Supreme Court has ruled that CMS has the final say in any State Plan and State Plan Amendments. *Douglas v. Independent Living Center of Southern California, Inc.*, 565 U.S. 606, 610, 611 (2012); *Wilder v. Virginia Hospital Assn.*, 496 U.S. 498, 502 (1990). 42 U.S.C. §§ 1316(a)(1), (b), 1396a(a), (b); 42 CFR § 430.10 et seq. (2010).

28.     There is no authority that demonstrates that the CMS approved Illinois to enact a procedure whereby it can reject a MEDI admission packet for any reason, and not permit the nursing facility to simply correct the error on the submitted packet. Further, there is no authority that demonstrates that the CMS approved Defendants to require the nursing facility to submit an entirely new MEDI admission packet, or reject a new MEDI admission packet because the date on the new submission does not match the original facility admission date.

29.     Regardless of this lack of authority, Defendants have refused to pay benefits on the basis of this "alleged" authority on many occasions with the effect that residents have been denied benefits for which they have already proven their eligibility.

30.     Although 89 Ill. Adm. Code § 140.513 and 305 ILCS 5/5-5 have a material effect on the Medicaid benefits received by eligible nursing facility residents, the State of Illinois has never amended its State Medicaid plan to include them and, consequently, they have never been approved by the Centers for Medicare and Medicaid Services ("CMS").

**IV.     Defendants Delay Their Decisions on MEDI Admission Packets**

31.     Because of the deadline in 89 Ill. Adm. Code § 140.513 and the non-payment policy created by 305 ILCS 5/5-5, Defendants have a financial incentive to delay denial of the MEDI

admission packets until after the deadline in 89 Ill. Adm. Code § 140.513 for submitting the packets has passed. If the deadline has passed when Defendants ultimately reject a timely MEDI admission packet, the nursing facility will no longer have the opportunity to submit a new timely MEDI admission packet and Defendants can deny the payment of long-term care benefits before the date of the new packet's submission.

32.     Defendants usually take longer than 45 days to make a determination to accept or reject a MEDI admission packet. In fact, Defendants have a form email that they send in response to inquiries regarding the status of a MEDI admission packet:

> Due to the number of inquiry lists received a response may be expected in 4 to 6 weeks. Of course, this time frame is an estimate only and the response time could be longer depending on the volume of inquiries we receive at any given time. Lists are addressed this way in order to give all facilities in the 65 counties we serve equal access to information. Your list will be addressed in the order received. Thank you for your patience.

According to Defendants' own communications, it may take them over six weeks just to respond to an inquiry about the status of a MEDI admission packet, let alone make a substantive determination to approve or disapprove the packet.

33.     The time that it takes to process the MEDI admission packets is due at least in part to willful ineptitude. Defendants have not established an effective method for requesting and tracking requests for additional information. This is most relevant to the information provided on the long-term care requests since insufficient information on a long-term care request will result in a rejected MEDI admission packet. Instead of sending an official form, a DHS agent will often simply send an email to a nursing facility or to an applicant's authorized representative requesting additional documentation. If the applicant's file is later transferred to another agent, the new agent has no awareness of these informal requests and the responses thereto because no log is kept of them and the new agent does not have access to the previous agent's email. This absence of record-

9

keeping draws out the application process and delays Defendants' ultimate decision to accept or reject a resident's MEDI admission packet.

34.     Forty-five days should be a reasonable time period for Defendants to take in deciding to accept or reject a MEDI admission packet. It is the amount of time within which Defendants must normally notify a Medicaid applicant of the disposition of his or her application. 89 Ill. Adm. Code § 10.420(b). The ABE application and long-term care request contain far more information than the MEDI admission packet. But the MEDI admission packets have instead become a backdoor means of avoiding this time limitation. Defendants ostensibly approve an applicant's ABE application within the required time period, but still retain the effective power to approve or deny benefits to the applicant outside of the time limitation by approving or denying the applicant's MEDI admission packet instead. Although the denial of the MEDI admission packet is ostensibly a denial of payment to the nursing facility rather than a denial of eligibility of the resident, the result is the same: the resident's nursing facility costs are not paid and the resident is left with an impossible bill for services. Medicaid benefits pay month by month and the delay removes coverage for at least a month, thereby Medicaid regulations are written that applications should be acted on promptly.  *See* 42 U.S.C. § 1396a(a)(8); *see also* 42 C.F.R. § 435.930(a).

35.     Federal regulations require decisions on an application for Medicaid benefits within 45 days and that should include decisions on MEDI admissions, concurrently.  See 42 CFR § 431.220(a)(1); *see also* 42 CFR §435.912(c)(3)(ii)

36.     Finally, this process also circumvents the three-month retroactive coverage that federal law normally makes available to Medicaid beneficiaries. The state is supposed to make benefits available to an applicant for eligible care and services received in and after the third month before the month in which the applicant applied. 42 U.S.C. § 1396a(a)(34); *see also* PM 17-02-

10

05-a. This retroactive coverage applies equally to applicants for long-term care coverage. 89 Ill. Adm. Code §§ 120.60-61. When Defendants refuse to pay benefits for services incurred before the submission date of a MEDI admission packet under 305 ILCS 5/5-5, they eliminate the retroactive coverage to which applicants are entitled under federal law.

**V.   Residents Do Not Receive Notice or Hearing with Respect to Rejection of the MEDI Admission Packets**

37.   When Defendants do eventually decide to reject a MEDI admission packet, they do not send a notice of denial or a notice of change of benefits to the resident, even though, for all practical purposes, the resident's benefits have been denied and changed relative to the initial approval of his or her ABE Application and long-term care benefits request.

38.   The only notification that Defendants send with respect to rejection of a MEDI admission packet is a Form IL 444-1010 ("Admit Rejection Letter") to the nursing facility, not the resident. And sometimes Defendants have failed to send even this notification and the nursing facility has learned of the rejection only orally, after persistent inquiry. Furthermore, although Form IL 444-1010 includes fillable areas to describe the reasons for rejection, in some cases, Defendants have still failed to inform the nursing facility of the reason for its rejection of the MEDI admission packet.

39.   Even though Defendants' rejection of a MEDI admission packet has the same effect on a nursing home resident as a denial of his or her ABE application or long-term care benefits request, namely, the resident's nursing facility bills are not paid by Medicaid, the resident has no way to appeal the determination like he or she would if it had been his or her ABE application or long-term care benefits request that had been denied. Not only does the resident not receive direct written notification of the rejection of his or her MEDI admission packet, the Admit

11

Rejection Letter sent to the nursing facility affirmatively states in bold type: "This is merely a notification and does not provide any rights to the facility nor impose any obligations on the State of Illinois. Further, this is not a decision on an individual's Medicaid eligibility and, therefore, is not appealable through the Department of Human Services Bureau of Hearings."

## VI.     Residents Are Harmed by Rejection of Their MEDI Admission Packets

40.     Although MEDI admission packets are submitted by a resident's nursing facility rather than by the resident him or herself, the rejection of a resident's MEDI admission packet harms the resident. Nursing facilities charge their residents for any services provided that Medicaid fails to cover unless some other payment source happens to cover the cost. Therefore, when Defendants refuse to pay a nursing facility for some or all of the services incurred by a resident, the resident is usually left holding the bill. The resident is then subject to collection referrals and other legal action to collect the outstanding balance. If the resident is still residing at the nursing facility, he or she is put at risk of being discharged from the facility for non-payment, placing his or her health, safety, and well-being in jeopardy. The result is the same as if the resident had never been approved for general or long-term Medicaid benefits.

## VII.    Facts Specific to the Named Plaintiffs

### A.     Salvatore Arcidiacono

41.     Due to multiple medical conditions, Mr. Arcidiacono required long-term care at a skilled nursing facility. He received such care at Bryn Mawr Care ("Bryn Mawr"), a skilled nursing facility located in Illinois.

42.     Mr. Arcidiacono resided at Bryn Mawr from his admission date on or about December 16, 2020 until he was discharged to Thorek Memorial Hospital on or about October 19,

12

2021.

43.     Mr. Arcidiacono was and is insolvent and is eligible for Medicaid benefits for long-term care.

44.     When Mr. Arcidiacono was admitted to Bryn Mawr, he was already approved for Medicaid and, therefore, had existing Medicaid benefits. Bryn Mawr submitted a MEDI admission packet on his behalf on December 16, 2020, the day he was admitted to the facility.

45.     Even though Bryn Mawr submitted Mr. Arcidiacono's MEDI admission packet on the day he was admitted to the facility, it was rejected on January 28, 2021 with the rejection letter stating that the packet had not been timely received.

46.     Mr. Arcidiacono filed a second MEDI admission packet on April 7, 2021. Defendants eventually approved this second packet and agreed to pay Mr. Arcidiacono's long-term care expenses from April 7, 2021 onward.

47.     However, based on his pre-existing Medicaid coverage, Mr. Arcidiacono is entitled to payment of his long-term care expenses over the entire period of his stay at Bryn Mawr, from December 16, 2020 until October 19, 2021.

48.     Accordingly, Defendants have failed to pay for Mr. Arcidiacono's long-term care expenses from December 16, 2020 through April 6, 2021, even though he is entitled to those amounts under federal law and the Illinois State Plan.

49.     Defendants' denial of benefits for the December 16, 2020 through April 6, 2021 period based on the allegedly untimely MEDI admission packet effects a change in the Medicaid benefits granted to Mr. Arcidiacono based on his pre-existing Medicaid coverage. Mr. Arcidiacono did not receive any opportunity to appeal this change, nor was he given notice of any such rights.

50.     As a result, Mr. Arcidiacono has been billed $13,675.20 by Bryn Mawr for the costs

of his uncovered long-term care. He is now subject to collections referrals and/or other legal actions to collect this outstanding balance.

51.     Mr. Arcidiacono would not have this outstanding balance but for Defendants' denial of benefits, which has no basis other than his nursing facility's alleged failure to comply perfectly with the unauthorized MEDI admission packet submission process.

**B.     William Brown**

52.     Due to multiple medical conditions, Mr. Brown required long-term care at a skilled nursing facility. He received such care at Generations at Applewood ("Applewood"), a skilled nursing facility located in Illinois.

53.     Mr. Brown resided at Applewood from his admission date on or about March 30, 2021 until he was discharged on or about April 23, 2021.

54.     Mr. Brown was and is insolvent and is eligible for Medicaid benefits for long-term care.

55.     When Mr. Brown was admitted to Applewood, he was already approved for Medicaid and, therefore, had existing Medicaid benefits. Applewood submitted a MEDI admission packet on his behalf on April 13, 2021, fourteen days after Mr. Brown's admission date.

56.     Mr. Brown's MEDI admission packet was rejected, but neither he nor his authorized representative nor Applewood received any rejection letter or other written documentation of the rejection. Defendants confirmed Mr. Brown's rejection orally to Applewood and alleged that no MEDI admission packet had been received.

57.     Mr. Brown's pre-existing Medicaid coverage entitled him to payment of his long-term care expenses for the entire period of his stay at Applewood, *i.e.* from March 30, 2021 until April 23, 2021; but Defendants refused to pay any amount of this expense.

58.     Defendants' denial of benefits for this period based on an allegedly unsubmitted MEDI admission packet effects a change in the Medicaid benefits granted to Mr. Brown based on his pre-existing Medicaid coverage. Mr. Brown did not receive any opportunity to appeal this change, nor was he given notice of any such rights.

59.     As a result, Mr. Brown has been billed $4,929.10 by Applewood for the costs of his uncovered long-term care. He is now subject to collections referrals and/or other legal actions to collect this outstanding balance.

60.     Mr. Brown would not have this outstanding balance but for Defendants' denial of benefits, which has no basis other than Mr. Brown's alleged failure to comply with the unauthorized Admit Pack submission process.

**C.     William Sarchet**

61.     Due to multiple medical conditions, Mr. Sarchet required long-term care at a skilled nursing facility. He received such care at Bryn Mawr Care ("Bryn Mawr"), a skilled nursing facility located in Illinois.

62.     Mr. Sarchet resided at Bryn Mawr from his admission date on or about November 8, 2018 until he was discharged on or about May 4, 2021.

63.     Mr. Sarchet was and is insolvent and is eligible for Medicaid benefits for long-term care.

64.     When Mr. Sarchet was admitted to Bryn Mawr, he was already approved for Medicaid and, therefore, had existing Medicaid benefits. Bryn Mawr submitted a MEDI admission packet on his behalf on November 8, 2018, which was also Mr. Sarchet's admission date.

65.     Mr. Sarchet's MEDI admission packet was rejected, however, that rejection did not begin until April 20, 2019. Medicaid benefits were paid from November 8, 2018 until April 20,

2019.  He has a one-year gap in coverage, presumably due to the rejection of his MEDI admission packet, from April 20, 2019, through April 20, 2020.  On April 20, 2020, his Medicaid benefits resumed, and benefits continued to be paid until his discharge on May 4, 2021.  Interestingly, Mr. Sarchet did receive a rejection letter dated April 20, 2019.  However, because his benefits were paid from November 2018 through the date of the letter, it seems his MEDI admission was processed, then later rejected erroneously.  There is no other explanation for the missing year of coverage from April 20, 2019 through April 20, 2020.

66.     Mr. Sarchet's pre-existing Medicaid coverage entitled him to payment of his long-term care expenses for the entire period of his stay at Bryn Mawr, i.e. from November 8, 2018 until May 4, 2021; but Defendants refused to pay any amount of this expense for the time period between April 20, 2019 through April 20, 2020, even though payments were made both before and after that time period, as outlined above.

67.     Defendants' denial of benefits for this period based on an originally processed but later rejected MEDI admission packet effects a change in the Medicaid benefits granted to Mr. Sarchet based on his pre-existing Medicaid coverage. Mr. Sarchet did not receive any opportunity to appeal this change, nor was he given notice of any such rights.

68.     As a result, Mr. Sarchet has been billed $49,410.00 by Bryn Mawr for the costs of his uncovered long-term care. He is now subject to collections referrals and/or other legal actions to collect this outstanding balance.

69.     Mr. Sarchet would not have this outstanding balance but for Defendants' denial of benefits, which has no basis other than Mr. Sarchet's alleged failure to comply with the unauthorized Admit Pack submission process.

**CLASS ALLEGATIONS**

70.     Plaintiffs bring this class action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure ("Rule") 23(b)(2) and (b)(3).

## I.     Class Definition

71.     The class that Plaintiffs seek to represent consists of, and is defined as, all persons:

(1)     who require or required long-term care at a skilled nursing facility and are currently, or were previously, residing at a skilled nursing facility in the State of Illinois;

(2)     who are or were eligible for long-term care Medicaid benefits;

(3)     who submitted long-term care Medicaid applications and/or MEDI admission packets; and

(4)     whose MEDI admission packets were rejected after such persons were approved for long-term care Medicaid benefits even if subsequent MEDI admission packets were approved at a later date.

## II.     Rule 23(a) Requirements

72.     Under Rule 23(a), Plaintiffs may sue on behalf of all class members if (1) there are questions of law or fact common to the class; (2) Plaintiffs' claims are typical of the claims of the class; (3) the class is so numerous that joinder of all members is impracticable; and (4) Plaintiffs will fairly and adequately protect the interests of the class.

### A.     Common Questions of Law and Fact

73.     There are questions of law or fact common to the class members, including Plaintiffs. Issues that will affect all of the class members include, but are not limited to, the following:

- Whether the MEDI admission packet process, including 89 Ill. Adm. Code § 140.513 and relevant portions of 305 ILCS 5/5-5, has been approved by

CMS;

- Whether Defendants' practice of refusing to pay long-term care Medicaid benefits on the basis of imperfect compliance with the MEDI admission packet process violates an eligible beneficiary's due process rights;

- Whether the class members are entitled to administrative appeal of Defendants' refusal to pay long-term care Medicaid benefits on the basis of imperfect compliance with the MEDI admission packet process;

- Whether Defendants' MEDI admission packet practices cause class members to become unable to obtain nursing facility services necessary for their health and welfare; and

- Whether Defendants' MEDI admission packet practices cause Defendants to unreasonably delay providing long-term care Medicaid benefits.

**B.      Typicality**

74.      The named Plaintiffs are members of the class and the claims they assert are typical of the claims of the class members because they arise from the same pattern of conduct by Defendants. Specifically, Defendants have refused to pay long-term care Medicaid benefits to the nursing facilities where Mr. Arcidiacono, Mr. Brown, and Mr. Sarchet resided because of alleged failure to comply with the MEDI admission packet process even though both plaintiffs were otherwise approved for such benefits.

75.      Each of the class members has been injured in the same way and because of the same process; if they were to bring their claims in separate suits, the claims would be based on the same legal theories and they would seek identical relief, including injunctive relief requiring Defendants to provide administrative appeal of the rejection of the MEDI admission packets.

**C.      Numerosity and Impracticability of Joinder**

76.      The class that Plaintiffs seek to represent is so numerous that joinder of all members is impracticable. The State of Illinois is home to more than 40,000 nursing home residents who receive Medicaid assistance. Plaintiffs believe that there are at least 50 potential class members.

77.     It is impracticable to bring a suit for each class member not only because of the sheer number of class members, but because Defendants have systematically mooted out named plaintiffs from two previous lawsuits filed in this court, with respect to the same issues raised here, before the merits of the issues could be decided.

78.     The first such lawsuit, *Daly v. Eagleson*,[1] was brought in 2019 by thirteen plaintiffs asserting claims nearly identical to those asserted here. Even though Defendants had claimed prior to litigation that they were incapable of backdating admissions, they figured out how to do so after the lawsuit was filed. They corrected the issues and paid out the claims of the named plaintiffs who did not die during the pendency of the case until all claims were mooted and the case was dismissed before the merits could be decided. Since the nature of the plaintiffs is that they require round-the-clock care in a facility, many of them are elderly and the chance that they will die during the pendency of a lawsuit is great.

79.     Although Defendants paid the claims in full of every named plaintiff in the *Daly* suit who did not die while the litigation was pending, they continued the practices that gave rise to the lawsuit in the first place. Therefore, a new set of plaintiffs brought nearly identical claims in a second suit: *Adkisson v. Eagleson*.[2] But once again, Defendants mooted the named plaintiffs' claims by paying them in full until the case was dismissed for mootness before the merits could be decided even while continuing their refusal to pay the claims of other similarly-situated individuals.

80.     Plaintiffs now bring this suit, asserting nearly identical claims to those asserted in the *Daly* and *Adkisson* suits. Class certification is necessary to prevent Defendants from avoiding

---

[1]   Case No. 19-CV-06020 in the U.S. District Court of the Northern District of Illinois.

[2]   Case No. 22-C-63 in the U.S. District Court of the Northern District of Illinois.

a resolution of the issues on the merits by paying in full the claims of only the named plaintiffs.

## D.     Adequacy of Representation

81.     Plaintiffs will fairly and adequately protect the interests of the class. Specifically, Plaintiffs (1) are members of the class; (2) have the same interests as, and no conflicts with, the class members; (3) suffered the same injury as the class members; and (4) have competent counsel qualified, experienced, and able to conduct the litigation and to meet the time and fiscal demands required to litigate a class action of this size and complexity.

## III.     Rule 23(b) Requirements

82.     In addition to the Rule 23(a) requirements, Plaintiffs may maintain a class action for the reasons in Rule 23(b)(2) and (b)(3) because Defendants have acted on grounds that apply generally to the class and because the questions of law and fact common to the class members predominate over questions affecting only individual members.

## A.  Defendants Have Acted on Grounds Generally Applicable to the Class

83.     Defendants have acted on grounds generally applicable to all proposed class members such that final injunctive and declaratory relief is appropriate for the class as a whole. Specifically, Defendants have improperly used the MEDI admission packet process to deny payment of class members' long-term care benefits without any means to administratively appeal the denial. Appropriate declaratory and injunctive relief to remedy these actions includes declaring the practice is illegal and requiring Defendants to provide a notice and hearing to class members with respect to the denied benefits. Both of these remedies are appropriate to the class as a whole.

**B. Common Questions of Law and Fact Predominate**

84.     In addition, common questions of law and fact predominate over any questions affecting only individual members, and the class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Of necessity, the individual class members are in poor health for one reason or another, which requires them to have long-term care in a skilled nursing facility, and they also have few financial resources, otherwise they would not be eligible for Medicaid; they are not interested in individually controlling the prosecution of separate actions. Furthermore, since Plaintiffs are requesting only that Defendants be required to process MEDI admission packets timely and to provide notice and an administrative hearing to class members for benefits denied on the basis of the MEDI admission packet process, virtually all individualized determinations will be relevant to the administrative process, not to the present class action suit. For these reasons, a class action will be superior to other methods for fairly and efficiently adjudicating this matter.

## CAUSES OF ACTION

**I.   Count I: Due Process Violation – Defendants Failed to Provide Adequate Notice and Hearing**

85.     The allegations contained in the paragraphs above are hereby incorporated by reference as if fully set forth herein.

86.     The Fourteenth Amendment prohibits the States from depriving any person of life, liberty, or property without due process of law.

87.     Plaintiffs assert a claim against Defendants for violation of their due process rights both directly under the Fourteenth Amendment and via 42 U.S.C. § 1983, which permits a suit to be brought against any person acting under color of state or local law for the deprivation of any

rights, privileges, or immunities secured by the Constitution and laws of the United States.

88.     Defendants deprived Plaintiffs of their property interest to which Plaintiffs had a legitimate claim of entitlement by failing to provide notice of denial of benefits and failing to provide an opportunity to appeal denied benefits.

89.     Defendants deprived Plaintiffs of their property interests to which Plaintiffs had a legitimate claim of entitlement by failing to provide notice of.

90.     "To demonstrate a procedural due process violation of a property right, the plaintiff must establish there is (1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process." *Price v. Board of Educ. of City of Chicago*, 755 F.3d 605, 607 (7th Cir. 2014).

91.     The interest of the eligible recipient in the uninterrupted receipt of public assistance, which provides him with essential food, clothing, housing, and medical care, coupled with the State's interest that his payments not be erroneously terminated, clearly outweighs the State's competing concern to prevent any increase in its fiscal and administrative burdens. *Goldberg v. Kelly*, 397 U.S. 254, at 264-266 (1970).

92.     *Goldberg* provides that a pre-termination evidentiary hearing is necessary to provide the welfare recipient with procedural due process. Further, the recipient must be provided with timely and adequate notice detailing the reasons for termination, and an effective opportunity to defend by confronting adverse witnesses and by presenting his own arguments and evidence orally before the decisionmaker. No such hearing *or* notice is taking place when PRU unilaterally redetermines the Notices of Eligibility issued to otherwise eligible residents, rendering them suddenly ineligible.

93.     The procedures implemented by Defendants to deprive Plaintiffs of their property

interest are and were constitutionally insufficient.

94.     To comply with the Due Process guarantees under the United States Constitution, the Defendants must provide the Plaintiffs with a meaningful notice that apprises them of the reasons for a denial, the authority for the denial, and an opportunity to appeal such denial.

95.     Plaintiffs and the approved beneficiary residents who are receiving care at Plaintiff facilities are entitled to a hearing when such benefits are denied to them for the reasons enumerated under the Federal Medicaid act, and as outlined in *Goldberg*.

96.     The above acts were committed under color of state law by the Defendants. Said acts were committed by the Defendants by and through representatives of the Defendants acting in their official capacities pursuant to the statutes, ordinances, laws and policies of the Defendants.

97.     The Defendants acted willfully, knowingly, and purposefully with the specific intent to deprive Plaintiffs of their rights, privileges, or immunities secured by the Constitution and laws by the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States and by 42 U.S.C. § 1983.

98.     In this case, Plaintiffs have cognizable property interests in their applications for long-term care benefits under the Medicaid program and in the payment of those benefits to the extent they are qualified for them.

99.     Defendants have deprived Plaintiffs of those property interests by, without legal basis, refusing to pay benefits to the nursing facilities at which Plaintiffs resided. This deprives Plaintiffs of the medical assistance to which they are entitled and effectively denies their applications.

100.    Defendants have denied due process to Plaintiffs by failing to notify Plaintiffs of Defendants' refusal to pay the benefits and by failing to provide any hearing to Plaintiffs with

respect to the refusal.

101.    Defendants' actions are willful, knowing, and purposeful with the specific intent to deprive Plaintiffs and the class members of their rights, privileges, or immunities secured by the Fourteenth Amendment.

102.    As a consequence of Defendants' actions, Plaintiffs and the class members have suffered damages, including monetary damages for the unpaid amounts charged by the nursing facilities at which they resided. Plaintiffs and the class members almost certainly cannot pay these amounts and will be subject to collections referrals and/or other legal actions to collect them, resulting in stress and mental anguish.

103.    For these reasons, Defendants have violated Plaintiffs' due process rights under the Fourteenth Amendment and Plaintiffs are entitled to the injunctive and declaratory relief demanded below.

## II.    Count II: Violation of Federal Statutes Requiring Defendants to Provide Necessary Medical Assistance

104.    The allegations contained in the paragraphs above are hereby incorporated by reference as if fully set forth herein.

105.    42 U.S.C. §§ 1396a(a)(10)(A) and 1396d(a)(4)(A) require Defendants to pay for the costs of nursing facility services necessary for Plaintiffs' health and welfare.

106.    On the basis of the MEDI admission packet process, Defendants have refused to pay for some or all of the nursing facility services provided to Plaintiffs, even though Plaintiffs are qualified for such benefits.

107.    The MEDI admission packet process is not a legitimate basis on which to deny payment of nursing facility services because the process has never been approved by CMS as

required by 42 C.F.R. § 430.12(c)(1)(ii). 89 Ill. Adm. Code § 140.513 and 305 ILCS 5/5-5 in particular have never been approved by CMS.

108.    Furthermore, even if the MEDI admission packet process were approved by CMS, Defendants have implemented the process in a way that is arbitrary and capricious, rejecting packets for trivial reasons.

109.    Accordingly, Defendants have deprived Plaintiffs of a right and privilege secured to them by federal law and, therefore, Plaintiffs may bring a claim against Defendants for the deprivation via 42 U.S.C. § 1983.

110.    Furthermore, an agency's failure to follow applicable statutes may also constitute a cognizable due process claim. *See Jideonwo v. I.N.S.*, 224 F.3d 692, 697 (7th Cir. 2000) (finding cognizable due process claim where agency took away procedure to which plaintiff had a right granted by statute).

111.    Accordingly, Plaintiffs assert a due process violation, both directly under the Fourteenth Amendment and via 42 U.S.C. § 1983, for Defendants' failure to follow 42 U.S.C. §§ 1396a(a)(10)(A) and 1396d(a)(4)(A).

112.    Defendants' refusal to pay for nursing facility services provided to Plaintiffs is repeated, willful, and knowing.

113.    For these reasons, Plaintiffs are entitled to the injunctive and declaratory relief demanded below.

### III.    Count III: Violation of Statutes and Regulations Requiring Defendants to Furnish Medical Assistance with Reasonable Promptness

114.    The allegations contained in the paragraphs above are hereby incorporated by reference as if fully set forth herein.

115.    42 U.S.C. § 1396a(a)(8) requires Defendants to furnish medical assistance to all eligible individuals with reasonable promptness. 89 Ill. Adm. Code § 10.420(b) ordinarily requires Defendants to notify a Medicaid applicant of the disposition of his or her application within 45 days.

116.    42 C.F.R. § 435.930 further requires Defendants to furnish Medicaid promptly to beneficiaries without delay caused by Defendants' administrative procedures and to continue furnishing it regularly until the beneficiary is found to be ineligible.

117.    Defendants have used the MEDI admission packet process to delay furnishing medical assistance to eligible beneficiaries beyond the 45 days that would ordinarily be considered "reasonably prompt." Even responding to an inquiry about the status of a MEDI admission packet may take longer than six weeks, according to Defendants' own communications. The processing of MEDI admission packets is a ministerial task. There is no reason why it should take so long when a beneficiary has already been found eligible for long-term care benefits.

118.    Defendants' determinations on MEDI admission packets often take so long that, by the time a determination is made, the (unapproved) deadline for submitting a MEDI admission packet has passed. Since Defendants allow correction of a MEDI admission packet only by filing a new admission packet, Defendants' delay deprives Plaintiffs' nursing facilities of the opportunity to correct even minor errors in the MEDI admission packets within the submission deadline. For this reason as well, Defendants' determinations on the MEDI admission packets are not reasonably prompt under the circumstances.

119.    Accordingly, Defendants have deprived Plaintiffs of the right and privilege secured to them by federal law of the prompt furnishing of medical assistance and, therefore, Plaintiffs may bring a claim against Defendants for the deprivation via 42 U.S.C. § 1983.

26

120.    Furthermore, an agency's failure to follow its own regulations or applicable statutes may constitute a cognizable due process claim. *See Taylor v. Franzen*, 417 N.E.2d 242, 245 (Ill. App. 1981) (recognizing that "disregard of administrative regulation may constitute a due process violation," but deciding case on other grounds); *Jideonwo*, 224 F.3d at 697.

121.    Accordingly, Plaintiffs assert a due process violation, both directly under the Fourteenth Amendment and via 42 U.S.C. § 1983, for Defendants' failure to furnish medical assistance to Plaintiffs with reasonable promptness.

122.    Defendants' failure to provide medical assistance to Plaintiffs with reasonable promptness is repeated, willful, and knowing.

123.    For these reasons, Plaintiffs are entitled to the injunctive and declaratory relief demanded below.

## IV.    Count IV: Declaratory Judgment

124.    The allegations contained in the paragraphs above are hereby incorporated by reference as if fully set forth herein.

125.    For the reasons set forth above, an actual, genuine, subsisting, and justiciable controversy exists between Plaintiffs and Defendants arising out of Defendants' failure to make a prompt determination on the MEDI admission packets, failure to notify Plaintiffs of the rejection of their MEDI admission packets, failure to provide a hearing on the rejection of their MEDI admission packets, and use of the MEDI admission packet process as a basis for denying payment of long-term care benefits to which Plaintiffs are entitled.

126.    Accordingly, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, Plaintiffs seek declarations by the Court as follows:

a.   that Defendants have deprived Plaintiffs and the class members of due process under

27

the Fourteenth Amendment by failing to provide them with notice and a hearing regarding Defendants' refusal to pay long-term care benefits on the basis of alleged imperfect compliance with the MEDI admission packet process;

b.  that Defendants may not, on the basis of alleged imperfect compliance with the MEDI admission packet process, refuse to pay long-term care benefits of persons who have otherwise been determined eligible for such benefits under the Medicaid program;

c.  that Defendants have violated 42 U.S.C. §§ 1396a(a)(10)(A) and 1396d(a)(4)(A) by failing to pay for nursing facility services to which Plaintiffs and the class members are entitled;

d.  that a processing time longer than 45 days for the MEDI admission packets is not reasonably prompt within the meaning of 42 U.S.C. § 1396a(a)(8);

e.  that Defendants have violated 42 U.S.C. § 1396a(a)(8) by failing to pay for the nursing facility services of Plaintiffs and the class members with reasonable promptness and to continue furnishing medical assistance regularly to Plaintiffs and the class members while they continued to be eligible for such assistance; and

f.  that Defendants must issue a written notice of the denial of the MEDI admission packet and allow for an appeals process, including the continuation of benefits until a final determination is made regarding the appeal in accordance with the Fourteenth Amendment, 42. U.S.C § 1983 and *Goldberg*.

127.    The Court's ruling hereunder will make certain that which is uncertain and secure that which is insecure.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor against

Defendants and order the following relief and remedies:

a.  assume jurisdiction over this action and maintain continuing jurisdiction until Defendants are in full compliance with every order of this Court;

b.  certify this action as a class action, proper and maintainable pursuant to Federal Rule of Civil Procedure 23, declare that Plaintiffs are the proper class representatives, and appoint Plaintiffs' counsel as class counsel;

c.  make the declarations requested by Plaintiffs in Count IV above;

d.  issue permanent injunctive relief requiring Defendants to, within 45 days, make a determination in a Notice of Decision on all MEDI admission packets that have been pending for more than 45 days;

e.  issue permanent injunctive relief requiring Defendants, going forward, to accept or reject all MEDI admission packets within 45 days of receipt or, in the alternative, within any other time period that the Court may determine is reasonably prompt;

f.  issue permanent injunctive relief requiring Defendants, going forward, to issue a Notice of Decision addressed to the applicant/beneficiary of any decision made by Defendants to reject or approve a MEDI admission packet;

g.  issue permanent injunctive relief requiring Defendants, going forward, to provide a hearing upon request to any applicant/beneficiary whose MEDI admission packet is rejected in order to appeal the rejection;

h.  award Plaintiffs the costs of this action, including reasonable attorney fees, pursuant to 42 U.S.C. § 1988; and

i.  take any other actions necessary, proper, or appropriate to remedy Defendants' violations of federal and state law.

Respectfully submitted,

/s/ Amy C. Baughman
Amy C. Baughman
Bar No. 0077621
sb2 inc.
1426 N. 3rd Street, Suite 120
P.O. Box 5400
Harrisburg, PA 17102
Telephone: (843) 359-1095
Facsimile: (717) 909-5925
abaughman@sb2inc.com
Attorney for Plaintiffs